UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOANNE RODRIGUES,

         Plaintiff,

    v.

ALLIANT CREDIT UNION,

         Defendant.

Case No. 21-cv-01111-DMR

**ORDER ON MOTION TO DISMISS**

Re: Dkt. No. 54

Plaintiff Joanne Rodrigues alleges that Defendant Alliant Credit Union ("Alliant") violated its account agreement with her when it froze her access to her bank accounts as part of her divorce proceedings. Alliant now moves to dismiss Rodrigues's First Amended Complaint ("FAC"). The court held a hearing on the motion on March 10, 2022. For the following reasons, the court grants the motion to dismiss in part and denies it in part.

## I.    BACKGROUND

The following facts are in the FAC.[1]  Alliant Credit Union is one of the largest credit unions in the United States with more than $12 billion in assets.  FAC ¶ 8.  Its state of incorporation and principal place of business is Illinois.  *Id.* ¶ 3.  Rodrigues is a California resident.  *Id.* ¶ 2.  On January 5, 2018, Rodrigues joined Alliant and entered into a written membership and account agreement.  *Id.* ¶¶ 9-10.  Rodrigues holds three bank accounts with Alliant numbered as XXX1977-01, XXX1977-40, and XXX1977-60 (together, the "disputed accounts") with deposits totaling $57,000.  *Id.* ¶¶ 13-14.  Rodrigues used those funds to pay for the necessities of life, including paying for food and shelter for her and her two minor children.  *Id.* ¶

---

[1] When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted).

15.

On May 26, 2019, Rodrigues opened a certificate of deposit ("CD") in her name only with a one-year maturity date.  FAC ¶ 11.  She opened the CD under account number XXX1977-60 and deposited $55,000 into it.  *Id.*  Alliant sent her a Notice of Certificate, which stated a grace period for her timed CD account from May 26, 2020 through June 5, 2020.  *Id.* ¶ 12.

On February 27, 2020, Rodrigues initiated marriage dissolution proceedings against her spouse Nathan Craig in Santa Clara County Superior Court.  FAC ¶ 16.[2]  On May 29, 2020, Craig's divorce attorney, Gretchen Boger, sent a letter to Alliant stating that when Rodrigues filed her marriage dissolution petition, the family court instituted a Standard Family Law Restraining Order ("SFLRO").  *Id.* ¶ 17.  Boger's letter demanded that Alliant freeze all of Rodrigues's accounts pursuant to the SFLRO:

> Pursuant to the SFLRO, both parties are restrained from transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, whether community or separate. Without an agreement of the parties or an order of the Court.  The SFLRO covers all property, including the accounts held by [Alliant] in Mrs. Rodrigues-Craig's name. . . .
>
> Mr. Craig does not consent to any withdrawals or transfers of any kind regarding the accounts in Mrs. Rodrigues-Craig's name held with Alliant Credit Union.  These accounts cannot be accessed by Mrs. Rodrigues-Craig unless there is a court order permitting it.  Likewise, there should be no transfers made from these accounts . . . In the event any funds are found to be transferred out of these accounts, my office will hold Alliant Credit Union liable for its violation of the SFLRO.  These accounts should be frozen or locked by your institution.

*Id.*

Around June 1, 2020, Rodrigues tried to access the disputed accounts online but received an error message directing her to contact Alliant.  FAC ¶ 18.  Alliant informed her that her accounts were frozen due to a "court order," and that she was unable to access them.  *Id.* ¶ 19.  That same day, Alliant's counsel responded to Boger's letter by email.  Alliant's email stated that "Mrs. Rodrigues-Craig's accounts have been frozen in light of your threat to hold the credit union

---

[2] Rodrigues provided factual background about the family court proceedings in a declaration accompanying her opposition.  [Docket No. 59-1.]  The court cannot consider this information because in analyzing a motion to dismiss, the court can only review the allegations in the pleadings and materials that may be incorporated by reference or judicially noticed, as discussed below.

1    liable for any withdrawals allegedly in violation of the standard restraining order in this case.  No

2    withdrawals have been made since receipt of your letter."  *Id.* ¶ 21.  The email went on to contend,

3    however, that Boger had overstated the scope of the SFLRO:

4

5        The court entered the restraining order when the lawsuit was filed in February 2020.  The
         credit union is not a party to the action.  You did not give the credit union notice of the

6        restraining order until May 29.  *Moreover, the restraining order allows the parties to make
         withdrawals in the "usual course of business or for the necessities of life." Therefore, you

7        overstated and misrepresented the scope of the restraining order in your letter by stating it
         prohibits all withdrawals without the consent of the parties of an order of the court.*

8    *Id.* ¶ 20 (emphasis added).

9        Rodrigues alleges that she made multiple complaints to Alliant—as well as the National

10   Credit Union Administration, Federal Deposit Insurance Corporation, and the California

11   Department of Business Oversight—about the restrictions on her accounts.  FAC ¶ 22.

12   Nevertheless, the accounts have remained frozen.  She claims that she has suffered severe

13   emotional distress as a result of Alliant's actions because she needs the funds to meet the basic

14   necessities of life.  *Id.* ¶ 23.

15       On February 14, 2021, Rodrigues filed her original complaint alleging breach of contract,

16   negligence, conversion, violations of California Financial Code section 1450 and the California

17   Unfair Competition Law ("UCL"), and a claim for declaratory relief.  She requested compensatory

18   damages, injunctive relief, restitution, declaratory relief, and fees and costs.  On August 30, 2021,

19   Rodrigues's attorney moved to withdraw as counsel.  [Docket Nos. 28, 30.]  The court granted the

20   unopposed motion on September 15, 2021, and Rodrigues since has represented herself. [Docket

21   No. 36.]

22       On December 17, 2021, the parties stipulated to allow Rodrigues to file her FAC.  [Docket

23   No. 46-47.]  The FAC addressed minor typographical errors (including modifying a duplicate

24   request for compensatory damages in the original complaint to a request for punitive damages) and

25   added a seventh claim for relief under the Truth in Savings Act ("TISA") and its implementing

26   regulations.  Alliant moved to dismiss the FAC on January 18, 2021 on jurisdictional and other

27   grounds.  [Docket No. 54 ("Mot."); Docket No. 60 ("Reply").]  Rodrigues opposed the motion.

28   [Docket No. 59 ("Opp'n").]

United States District Court
Northern District of California

3

United States District Court
Northern District of California

## II.    LEGAL STANDARD

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(1) is a challenge to the court's subject matter jurisdiction.  A court will dismiss a party's claim for lack of subject matter jurisdiction "only when the claim is so insubstantial, implausible, foreclosed by prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citation and quotation marks omitted).  When reviewing a 12(b)(1) motion, the court sculpts its approach according to whether the motion is "facial or factual." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  A facial challenge asserts that "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  A factual challenge asserts that subject-matter jurisdiction does not exist, independent of what is stated in the complaint. *White*, 227 F.3d at 1242.  In contrast with a facial challenge, a factual challenge permits the court to look beyond the complaint, without "presum[ing] the truthfulness of the plaintiff's allegations." *Id*. (citation omitted).  Even the presence of disputed material facts "will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (citations omitted).

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson*, 551 U.S. at 94, and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief," *Shroyer v. New Cingular Wireless Servs., Inc*., 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)) (quotation marks omitted).  A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).  In other words, the facts alleged must demonstrate "more than labels and

4

1   conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl.*

2   *Corp. v. Twombly*, 550 U.S. 554, 555 (2007).

3          Under Federal Rule of Civil Procedure 15(a), leave to amend should be granted as a matter

4   of course, at least until the defendant files a responsive pleading. Fed. R. Civ. P. 15(a)(1). After

5   that point, Rule 15(a) provides generally that leave to amend the pleadings before trial should be

6   given "freely . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "This policy is to be applied

7   with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir.

8   2003) (quotation omitted). However, leave to amend may be denied "where the amendment

9   would be futile." *Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir. 2009).

10          Pro se pleadings must be liberally construed and "held to less stringent standards than

11   formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94. "This rule relieves pro se

12   litigants from the strict application of procedural rules and demands that courts not hold missing or

13   inaccurate legal terminology or muddled draftsmanship against them." *Blaisdell v. Frappiea*, 729

14   F.3d 1237, 1241 (9th Cir. 2013); *see Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (en

15   banc). "This duty applies equally to pro se motions." *United States v. Qazi*, 975 F.3d 989, 993

16   (9th Cir. 2020).

**III.   DISCUSSION**

18          Alliant moves to dismiss the FAC for lack of subject matter jurisdiction, as well as for

19   failure to state cognizable claims for relief.[3] It requests that the court consider certain documents

20   either through judicial notice or incorporation by reference. Request for Judicial Notice ("RJN")

21   [Docket No. 56.][4] Alliant filed a second request for judicial notice with its reply brief.

22   Supplemental Request for Judicial Notice ("Suppl. RJN") [Docket No. 61.] Alliant submitted

23   declarations from Senior Corporate Counsel John Brom to support both of its requests for judicial

24   notice. Declaration of John Brom ("Brom Decl.") [Docket No. 54-2]; Supplemental Declaration

25

26   [3] Alliant styles its motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(6), but
    Rule 12(b)(1) governs such motions.

27
    [4] The original request for judicial notice was withdrawn and refiled after correction. [Docket Nos.
28   55, 56.]

*United States District Court*
*Northern District of California*

of John Brom ("Suppl. Brom Decl.") [Docket No. 60-1.]

Rodrigues opposes Alliant's motion and objects to both requests for judicial notice.  *See* Opp'n at 7-10; Obj. to Judicial Notice [Docket No. 63.]  The court addresses these threshold evidentiary questions before proceeding to the merits of Alliant's motion.

### A.    Evidentiary Matters

A district court generally may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  If "matters outside the pleading are presented to and not excluded by the court," the court must treat the motion as a Rule 56 motion for summary judgment.  *See* Fed. R. Civ. P. 12(d).  "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  "Both of these procedures permit district courts to consider materials outside a complaint, but each does so for different reasons and in different ways."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

Federal Rule of Evidence 201 governs judicial notice.  Under Rule 201, a court may take judicial notice of "an adjudicative fact if it is 'not subject to reasonable dispute.'"  *Id*. at 999 (quoting Fed. R. Evid. 201(b)).  A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  While a court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment, it may not take judicial notice of disputed facts stated in public records.  *Lee*, 250 F.3d at 690.  "Just because [a] document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."  *Khoja*, 899 F.3d at 999.  If a court takes judicial notice of a document, it must identify the specific fact or facts it is noticing from the document.  *Id*.

In contrast, the incorporation by reference doctrine is "a judicially-created doctrine that treats certain documents as though they are part of the complaint itself."  *Khoja*, 899 F.3d. at 1002.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    This is to prevent "plaintiffs from selecting only portions of documents that support their claims,

2    while omitting portions that weaken—or doom—their claims." *Id*.  Incorporation by reference is

3    appropriate "if the plaintiff refers extensively to the document or the document forms the basis of

4    the plaintiff's claim." *Id*. at 1002 (quoting *Ritchie*, 342 F.3d at 907); *see also Knievel v. ESPN*,

5    393 F.3d 1068, 1076 (9th Cir. 2005) (the doctrine applies in "situations in which the plaintiff's

6    claim depends on the contents of a document, the defendant attaches the document to its motion to

7    dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff

8    does not explicitly allege the contents of that document in the complaint").

9           However, if a document "merely creates a defense to the well-pled allegations in the

10    complaint, then that document did not necessarily form the basis of the complaint." *Khoja*, 899

11    F.3d at 999.  Further, "the mere mention of the existence of a document is insufficient to

12    incorporate the contents of a document." *Id*. (quoting *Coto Settlement v. Eisenberg*, 593 F.3d

13    1031, 1038 (9th Cir. 2010)).  "[T]he doctrine is not a tool for defendants to short-circuit the

14    resolution of a well-pleaded claim." *Id*.  Thus, "while a court "may assume [an incorporated

15    document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6) . . . it is

16    improper to assume the truth of an incorporated document if such assumptions only serve to

17    dispute facts stated in a well-pleaded complaint." *Id*.; *see also id*. at 1014 ("The incorporation-by-

18    reference doctrine does not override the fundamental rule that courts must interpret the allegations

19    and factual disputes in favor of the plaintiff at the pleading stage.").

20           There are "rare instances when assessing the sufficiency of a claim requires that the

21    document at issue be reviewed, even at the pleading stage." *Khoja*, 899 F.3d at 1002 (citing

22    *Knievel*, 393 F.3d at 1073-76 (involving an allegedly defamatory photograph; incorporation by

23    reference of surrounding photos and captions was proper to show that the disputed image and

24    caption were not "reasonably capable of sustaining a defamatory meaning," an element of the

25    defamation claim)).

26           The Ninth Circuit has cautioned courts about the appropriate use of judicial notice and

27    incorporation by reference when ruling on Rule 12(b)(6) motions:

28                 The overuse and improper application of judicial notice and the

1

2

3

4

5

6

7

incorporation-by-reference doctrine . . . can lead to unintended and harmful results. Defendants face an alluring temptation to pile on numerous documents to their motions to dismiss to undermine the complaint, and hopefully dismiss the case at an early stage. Yet the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery. . . . If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently "plausible" claim for relief. Such undermining of the usual pleading burdens is not the purpose of judicial notice or the incorporation-by-reference doctrine.

8

*Khoja*, 899 F.3d at 998 (internal citations omitted).

9

### 1.    Exhibits 1, 2, 10, and 11[5]

10

11

12

13

14

15

16

17

18

19

20

Exhibit 1 to the RJN is a copy of Alliant's November 2017 Account Agreement and Disclosures.  RJN Ex. 1 at 4-39.[6]  Exhibit 2 is a copy of the April 2021 Account Agreement and Disclosures.  RJN Ex. 2 at 40-62.  Alliant asserts that the 2017 agreement was operative at the time Rodrigues opened her account, and that the 2021 agreement currently is in effect.  Brom Decl. ¶¶ 5, 7; *see also* Reply at 6.  In the supplemental RJN, Alliant submits Exhibits 10 and 11, which are the account agreements from September 2018 and October 2020, respectively.  Suppl. RJN Ex. 10 at 3-17; Suppl. RJN Ex. 11 at 20-40.  Alliant asserts that all of the account agreements from 2017 through 2021 contain the same language regarding joint account ownership and argues that the court may incorporate all of the agreements by reference because the FAC refers to them in multiple places.  Mot. at 6; RJN at 2; *see* Suppl. Brom Decl. ¶ 7.  Rodrigues challenges the relevance and reliability of these exhibits.

21

22

Contrary to Alliant's characterization, the FAC only quotes the contractual language twice, and not extensively.  *See* FAC ¶¶ 10, 25.  These short quotations do not warrant incorporation by

23

24

25

[5] Pincites to documents in the RJN and supplemental RJN refer to court docket pagination. Rodrigues contends that the RJN is missing Exhibit 2, Opp'n at 8, but it is in the record starting at RJN page 40.

26

27

28

[6] Both parties use the terms "membership and account agreements" and "account agreements" interchangeably.  *See, e.g.*, FAC ¶ 10; Mot. at 8; Opp'n at 13; Reply at 6; Brom Decl. ¶¶ 5-7; Suppl. Brom Decl. ¶¶ 4-5.  The actual document is titled "Account Agreement and Disclosures" and it includes the "Membership and Account Agreement."  *See* RJN Ex. 1 at 4-5.  The court uses the term "account agreement" for simplicity except when quoting from the parties' papers.

United States District Court
Northern District of California

1    reference of the entire contracts.  *See Coto*, 593 F.3d at 1038 ("[T]he mere mention of the

2    existence of a document is insufficient to incorporate the contents of a document.").

3        Moreover, Alliant wants to rely on some of the contractual language to defend against

4    Rodrigues's claims on the merits rather than to challenge the sufficiency of her pleading.  For

5    example, Alliant points to certain contract language to argue that it did not breach the agreement

6    by restricting the disputed accounts due to their joint ownership and receipt of a written notice of

7    dispute.  Mot. at 9.  The court cannot consider the contractual language for that purpose because

8    doing so would enable Alliant to "insert [its] own version of events into the complaint" without

9    giving Rodrigues an "opportunity to respond to the defendant's new version of the facts."  *Khoja*,

10    899 F.3d at 1002-03.

11        By contrast, section 12 of the contract forms the basis of Rodrigues's allegation that

12    Alliant is liable for failing to "properly complete a transaction" by restricting her access to her

13    accounts.  Compl. ¶ 10; RJN Ex. 1 at 15.  The FAC only quotes part of section 12.  Compl. ¶ 10.

14    As discussed further below, Alliant relies on the full language of section 12 to argue that it is

15    exempt from liability because the accounts were "subject to legal process."  Mot. at 9; RJN Ex. 1

16    at 15.  Here, Alliant has demonstrated that section 12 of the 2017 contract is appropriate for

17    incorporation by reference because Rodrigues cannot unfairly base her claim on an excerpt of a

18    contract provision while leaving out other salient words in that provision.  *Khoja*, 899 F.3d at 1002

19    ("The doctrine prevents plaintiffs from selecting only portions of documents that support their

20    claims, while omitting portions of those very documents that weaken—or doom—their claims.").

21    Accordingly, the court incorporates by reference section 12 of the 2017 agreement (RJN Ex. 1 at

22    15) and denies the request to incorporate the entire agreement.

23        The court denies Alliant's request with respect to Exhibits 2, 10, and 11. The FAC makes

24    no reference to these subsequent versions of the account agreement.

25                    **2.      Exhibits 3, 4, and 12**

26        Exhibit 3 is a redacted checking and savings account statement from May 2019 for account

27    number XXX1977, which is under Rodrigues's name.  RJN Ex. 3 at 63.  It shows a withdrawal of

28    $55,000 from a savings account on May 26, 2019, which was deposited into Rodrigues's CD with

United States District Court
Northern District of California

9

a May 26, 2020 maturity date.[7]  *Id.*  Exhibit 4 is a Notice of Certificate for the CD issued on May

26, 2019.  RJN Ex. 4 at 66.  Exhibit 12 is the CD Maturity Statement, a redacted May 2020

checking and savings account statement in Rodrigues's name that reflects a transfer of $56,486.07

from the CD to a savings account on May 26, 2020.  Suppl. RJN at 41.  Alliant does not explain

why it seeks to incorporate Exhibits 3, 4, and 12 by reference.  However, it relies on them to argue

that Rodrigues jointly owned her accounts with Craig and that the funds used to open the CD were

transferred from that joint account, as discussed below.  Mot. at 3, 9; Reply at 8-9.

Exhibits 3, 4 and 12 are not subject to incorporation by reference.  They are not referenced

extensively in the FAC.  Moreover, Alliant inappropriately is attempting to use these exhibits to

defend itself on the merits against her claims rather than to challenge the sufficiency of her

pleading.

### 3.   Exhibits 5 and 6

Exhibit 5 is the May 29, 2020 letter from Gretchen Boger notifying Alliant of the SFLRO

and demanding that Alliant freeze the disputed accounts.  RJN Ex. 5 at 69-70.  Exhibit 6 is the

June 1, 2020 email from Alliant's counsel responding to Boger's letter.  RJN Ex. 6 at 72.

Rodrigues does not object to incorporation by reference of these two letters.  Opp'n at 7.  As their

contents form the basis of allegations in the FAC, Exhibits 5 and 6 are subject to incorporation by

reference.

### 4.   Exhibits 7, 8, and 9

Exhibit 7 comprises records from Rodrigues's state court marriage dissolution case,

including the summons, which contains the requirements of the SFLRO issued on February 27,

2020.  RJN Ex. 7 at 75-76.  Exhibits 8 and 9 are hearing transcripts from the marriage dissolution

proceedings, dated September 17 and December 20, 2020, respectively.  RJN Ex. 8 at 84-113;

RJN Ex. 9 at 115-36.  Alliant contends that these documents are judicially noticeable as official

records of the Santa Clara County Superior Court.  Mot. at 8; RJN at 2.  It relies on statements

from the transcripts to support its motion to dismiss the breach of contract claim.  Mot. at 10.

---

[7] The account statements call the CD in question a "share certificate."

United States District Court
Northern District of California

1    Rodrigues opposes judicial notice of most of Exhibit 7 with the exception of the summons

2    containing the SFLRO.  Opp'n at 9.  She asserts that the documents are not court orders but are

3    petitions and worksheets that are factually inaccurate.  *Id.*  Rodrigues also opposes judicial notice

4    of Exhibits 8 and 9 as they were unofficial transcripts of hearings that were not held under oath.

5    *Id.*

6    Federal courts may "take notice of proceedings in other courts, both within and without the

7    federal judicial system, if those proceedings have a direct relation to the matters at issue." *United*

8    *States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.

9    1992).  The court takes judicial notice of the existence of Rodrigues's marriage dissolution matter

10   in Santa Clara County Superior Court initiated on February 27, 2020.  It also takes judicial notice

11   of the language of the SFLRO because it is relevant to Rodrigues's allegations about Alliant's

12   restrictions on her account.  RJN Ex. 7 at 74-75.  The court declines to take judicial notice of the

13   remainder of Exhibit 7 as it is irrelevant to the dispute.  *See Threshold Enters. Ltd. v. Pressed*

14   *Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020) (concluding "it is appropriate to take

15   judicial notice only of the contents in the submitted documents that are relevant to the issues

16   presented . . . . To the extent the Court takes judicial notice that these documents contain certain

17   information, the Court notices only the fact that the documents contain the referenced content. The

18   Court does not take judicial notice of the truth of that content.").

19   The court declines to take judicial notice of Exhibits 8 and 9 as Rodrigues disputes the

20   authenticity of the transcripts and the veracity and relevance of statements made in those hearings.

21   *See Lee*, 250 F.3d at 689-90.

22   **B.    Subject-Matter Jurisdiction**

23   Alliant first contends that the case should be dismissed because this court lacks jurisdiction

24   over Rodrigues's claims as they are related to her marriage dissolution proceedings and belong in

25   family court.[8]  At the hearing, Alliant clarified its position.  It asserts that Rodrigues's requested

26   relief is not cognizable because it would essentially force this court to characterize the assets held

27

28   _____

[8] This amounts to a facial challenge to jurisdiction, even though Alliant does not label it as such.

United States District Court
Northern District of California

1    in the disputed accounts as community or separate property, which is solely within the family

2    court's jurisdiction.  Rodrigues counters that this court has jurisdiction because her lawsuit

3    challenges Alliant's alleged breach of the account agreement by restricting her access to the

4    accounts even though she intended to use the funds to pay for the "necessities of life," regardless

5    of how the assets ultimately are characterized by the family court.

6         Rodrigues has the better argument.  The FAC indicates that Rodrigues used and intended

7    to continue using the funds for the necessities of life.  FAC ¶¶ 15, 23.  In addition to damages,

8    Rodrigues seeks a court order declaring that she is authorized to withdraw and transfer funds from

9    her account.  FAC at 10.  As Rodrigues acknowledged at the hearing, she only intends to use the

10   funds for the necessities of life.  The SFLRO expressly permits Rodrigues and Craig to transfer

11   property "for the necessities of life."  RJN Ex. 7 at 75.  Should the court grant Rodrigues the relief

12   she requests, she would be able to withdraw money from the account for the necessities of life,

13   regardless of whether the family court decides that the account is jointly or separately owned or

14   involves community property assets.

15        The cases cited by Alliant, *Burkle v. Burkle*, 144 Cal. App. 4th 387 (2006), *Neal v.*

16   *Superior Court*, 90 Cal. App. 4th 22 (2001), and *Askew v. Askew*, 22 Cal. App. 4th 942 (1994), are

17   all distinguishable.  These cases stand for the proposition that "'family law cases 'should not be

18   allowed to spill over into civil law.'"  *Burkle*, 144 Cal. App. 4th at 393-94 (quoting *Neal*, 90 Cal.

19   App. 4th at 25 and citing *Askew*, 22 Cal. App. 4th at 965-66, among other cases); *see Neal*, 90 Cal.

20   App. 4th at 24 ("Almost all events in family law litigation can be reframed as civil law actions if a

21   litigant wants to be creative with various causes of action. It is therefore incumbent on courts to

22   examine the substance of claims, not just their nominal headings.").  They all entail civil lawsuits

23   addressing matters directly related to collection of family court judgments that were intended to

24   "preempt the family law court."  *Askew*, 22 Cal. App. 4th at 965; *see, e.g.*, *Burkle*, 144 Cal. App.

25   4th at 394-98 (lawsuit over ex-husband's failure to comply with a family court judgment to make

26   monthly payments to plaintiff); *Neal*, 90 Cal. App. 4th at 24-27 (lawsuit over outstanding child

27   support debts "merely family law waged by other means").  While Rodrigues's claims generally

28   relate to the dissolution of her marriage, her lawsuit is against a third party, not her ex-husband.

1    Rodrigues is not trying to collect on a family law judgment or re-litigate issues in her dissolution

2    case.  Accordingly, the court may exercise subject-matter jurisdiction over this case and denies

3    Alliant's motion on that basis.[9]

4          **C.    Breach of Contract**

5           For breach of contract, Rodrigues must plausibly allege "(1) the existence of the contract;

6    (2) [her] performance or excuse for nonperformance; (3) [Alliant's] breach; and (4) the resulting

7    damages to [Rodrigues]."  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 811, 821 (2011) (citation

8    omitted).[10]  The parties do not dispute the existence of a written account agreement, or that

9    Rodrigues performed under the agreement.  *See* Mot. at 8-10; FAC ¶¶ 25-27.  They contest the

10   remaining two elements.

11          Rodrigues alleges that Alliant breached the account agreement by freezing the disputed

12   accounts and refusing to allow her to access funds.  FAC ¶ 28.  Alliant points to section 12 of the

13   agreement to argue that it was not in breach when it froze the accounts because the funds were

14   subject to a legal process.  Mot. at 9-10.  Section 12 provides:

15               If we do not properly complete a transaction according to this
                 Agreement, we will be liable for your losses or damages not to exceed
16               the amount of the transaction, except as otherwise provided by law.
                 We will not be liable if: . . . (4) your account funds are subject to legal
17               process or other claim.

18   RJN Ex. 1 at 15.  Alliant contends that the SFLRO is a "legal process" that restrained Rodrigues

19

20   _____

     [9] On reply, Alliant raises the domestic relations exception as grounds for dismissal for lack of
21   subject-matter jurisdiction.  Reply at 3-4.  The court refuses to entertain arguments inappropriately
     raised for the first time on reply.  In any event, Alliant's improper argument fails on its merits.
22   The domestic relations exception "divests the federal court of diversity jurisdiction only in 'cases
     involving the issuance of a divorce, alimony, or child custody decree.'"  *Bailey v. MacFarland*, 5
23   F.4th 1092, 1095 (9th Cir. 2021) (quoting *Ankenbrandt v. Richards*, 504 U.S. 689, 704 (1992)).
     "The exception preserves jurisdiction for cases within the competency of federal courts while, at
24   the same time, preventing a party from making an end-run around a state-court status
     determination."  *Id.*  "[T]he domestic relations exception is narrow."  *Id.* at 1097.  The exception
25   does not apply here because this lawsuit does not involve the issuance of a divorce decree or order
     in Rodrigues's dissolution case.  Instead, it involves Rodrigues's access to her bank accounts that
26   Alliant restricted after receiving notice of the commencement of a divorce dispute.

27   [10] California law applies to federal diversity cases arising in California.  *Allstate Ins. Co. v. Smith*,
28   929 F.2d 447, 449 (9th Cir. 1991).

     United States District Court
     Northern District of California

                                                13

1   and Craig from making withdrawals from the account except for the necessities of life, absent a

2   court order. Mot. at 9-10. It also asserts that financial institutions are not required to police

3   accounts, and that it had no way of knowing how Rodrigues intended to use the funds in the

4   account, including for the necessities of life. *Id.* Alliant cites *SASA Investment Holdings, LLC v.*

5   *Chhatrala*, No. 18-CV-2735 W (BGS), 2020 WL 819016, at *4 (S.D. Cal. Feb. 19, 2020), in

6   which the court declared that "[u]nder California law, banks are not required to police fiduciary

7   accounts" (citing California Financial Code section 1450).

8          Rodrigues counters that the SFLRO is not a "legal process" within the meaning of section

9   12 of the agreement. She points to the language of the SFLRO, which draws from California

10   Financial Code section 1450(b), which in turn deals with adverse claims to bank deposits.[11]

---

[11] The SFLRO issued by the family court provides:

> "Starting immediately, you and your spouse or domestic partner are restrained from: . . . (3) transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life[.]"

RJN Ex. 7 at 75. The language of SFLRO is codified in California Family Code section 2040(a)(2)(A). The SFLRO only applies to "both parties" to the divorce and not to third parties. *See* Cal. Fam. Code § 2040(a)(1).

California Financial Code section 1450 provides:

> Notice to any bank of an adverse claim (the person making the adverse claim being hereafter called "adverse claimant") to a deposit standing on its books to the credit of or to personal property held for the account of any person shall be disregarded, and the bank, notwithstanding the notice, shall honor the checks, notes, or other instruments requiring payment of money by or for the account of the person to whose credit the account stands and on demand shall deliver that property to, or on the order of, the person for whose account the property is held, without any liability on the part of the bank; subject, however, to the exceptions provided in subdivisions (a) and (b)[.]

Cal. Fin. Code § 1450. The exceptions are as follows:

> (a) If an adverse claimant delivers to the bank at the office at which the deposit is carried or at which the property is held an affidavit of the adverse claimant stating that of the adverse claimant's own knowledge the person to whose credit the deposit stands or for whose account the property is held is a fiduciary for the adverse claimant and

14

1    Rodrigues argues that the SFLRO is not a legal process under Financial Code section

2  1450(b) because "there was no family law judgment or order in place in relation to these accounts

3  and the SFLROs are restraining the behavior of parties, not [the] account funds or against the

4  bank. The SFLROs are not a 'claim' on the account funds. The SFLROs are against the *parties* in

5  the dissolution proceeding[.]" Opp'n at 14. She asserts that the "restraining order must be against

6  the banks themselves, rather than the parties as in the SLFROs." *Id.* She then quotes Financial

7  Code section 1450(b). *Id.*

8    Neither party fully explained their arguments, leaving the court to guess at them. Boiled

9  down, the parties essentially dispute whether the SFLRO is a "legal process" as that term is used

10  in section 12 of the account agreement. Alliant asserts in conclusory fashion that the SFLRO is a

11  legal process. Presumably, Alliant is arguing that because the CD was subject to a legal process as

12  set forth in section 12, Alliant did not breach the agreement by freezing the accounts. Rodrigues,

13  by contrast, urges the court to interpret "legal process" in section 12 to refer only to legal claims

14  against the bank. She draws upon the language of the SFLRO and Financial Code section 1450.

15  Rodrigues presumably asserts that because the SFLRO is not a legal process as used in section 12,

16  Alliant breached the agreement when it denied her access to her accounts.

17  _____

18            that the adverse claimant has reason to believe the fiduciary is about
          to misappropriate the deposit or the property, and stating the facts on
19          which the claim of fiduciary relationship and the belief are founded,
          the bank shall refuse payment of the deposit and shall refuse to deliver
20          the property for a period of not more than three court days (including
          the day of delivery) from the date that the bank received the adverse
21          claimant's affidavit, without liability on its part and without liability
          for the sufficiency or truth of the facts alleged in the affidavit.
22

23          (b) If at any time, either before, after, or in the absence of the filing
          of an affidavit by the adverse claimant, the adverse claimant procures
24          and serves upon the bank at the office at which the deposit is carried
          or at which the property is held a restraining order, injunction, or other
25          appropriate order against the bank from a court of competent
          jurisdiction in an action in which the adverse claimant and all persons
26          in whose names the deposit stands or for whose account the property
          is held are parties, the bank shall comply with the order or injunction,
27          without liability on its part.

28  Cal. Fin. Code § 1450(a)-(b).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Both parties implicitly ask the court to interpret the phrase "legal process," which is not

2    defined in Section 12.  Neither party addressed the legal standards for contract interpretation or

3    grappled with how or whether the court should use the SFLRO or Financial Code section 1450 to

4    interpret "legal process" as the term is used in the account agreement.  California law is

5    unequivocal that "[t]he whole of a contract is to be taken together, so as to give effect to every

6    part, if reasonably practicable, each clause helping to interpret the other."  Cal. Civ. Code § 1641;

7    *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 17 (1995).  Therefore, "contracts must

8    be construed as a whole, that is, from their four corners, and the intention of the parties is to be

9    collected from the entire instrument and not detached portions thereof . . . . Individual clauses and

10   particular words must be considered in connection with the rest of the agreement, and all of the

11   writing and every word of it will, if possible, be given effect."  *Int'l Bhd. of Teamsters v. NASA*

12   *Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020) (quoting *Ajax Magnolia One Corp. v. S. Cal.*

13   *Edison Co.*, 167 Cal. App. 2d 743, 748 (1959)).  The full account agreement is not presently

14   before the court.  Accordingly, the court cannot construe the contractual term "legal process" at

15   this stage of the litigation.

16   In any event, even assuming that the SFLRO constitutes a legal process under the contract,

17   it expressly permits use of funds for the necessities of life.  Rodrigues plausibly alleges that

18   Alliant failed to give her access to the disputed accounts "to meet the basic necessities of life,"

19   which included "paying for food and shelter for Plaintiff and her two minor children."  FAC ¶¶ 15,

20   23.  Alliant's argument that the SFLRO qualifies as a legal process under the terms of the

21   agreement completely ignores this critical clause in the SFLRO.

22   Alliant also argues that it properly restricted Rodrigues's access because her accounts were

23   jointly owned, and certain terms of the agreement authorized it to suspend access or refuse to

24   allow withdrawals from accounts where there is a dispute between account owners or it receives

25   written notice of such a dispute.  *See* Mot. at 3, 9.  According to Alliant, Boger's letter qualified as

26   a "written notice of dispute between joint owners."  *Id.* at 9.

27   Rodrigues counters that Boger's letter was a notice of adverse claim to the CD.  Opp'n at

28   13-14.  As such, Alliant should have disregarded it in accordance with section 1450(a) because the

16

1   notice was not accompanied by an affidavit from Craig and properly served; even if the notice did

2   comply, Alliant could only freeze the account for "not more than three court days."  Opp'n at 13-

3   14; *see* Cal. Fin. Code § 1450(a); *see also Trabulsi v. Wells Fargo Bank, Nat'l Ass'n*, No. 17-cv-

4   02088-JLS, 2018 WL 6444897, at *2 (C.D. Cal. Nov. 16, 2018) (observing that the plaintiff's

5   "Notice of Adverse claim lacked the required affidavit and was sent to the wrong Wells Fargo

6   location.  Thus, Wells Fargo was required to "disregard" the Notice.  Moreover, even if the Notice

7   of Adverse Claim had been valid, it would have allowed Wells Fargo to freeze the account for

8   only three days" (internal citations omitted).)  Alliant responds that Craig "as a joint owner, cannot

9   legally be considered an adverse claimant."  Reply at 9; *see AARTS Prods., Inc. v. Crocker Nat'l*

10  *Bank*, 179 Cal. App. 3d 1061, 1068 (1986) (holding that the predecessor statute to section 1450

11  "does not apply to disputes arising between joint depositors).

12          Alliant's joint ownership argument fails because it raises factual questions that are not

13  appropriate for determination on the pleadings.  The FAC does not allege that the accounts were

14  jointly owned.  Instead, Rodrigues alleges that she opened the CD "in her name alone" and that

15  she "holds several bank accounts with Alliant."  FAC ¶¶ 11, 13.  Alliant bases its "joint

16  ownership" assertion on materials that are outside of the pleadings and that the court declined to

17  incorporate by reference, so the court cannot consider them.

18          Finally, Alliant contends that Rodrigues did not suffer any resulting damages because she

19  did not need the account funds for her necessities of life.  Mot. at 10.  This argument also fails

20  because it relies on materials outside the pleadings (the family court hearing transcripts) which are

21  not subject to judicial notice.

22          Accordingly, the court denies Defendant's motion to dismiss the breach of contract claim.

23      **D.      Negligence**

24          "Under California law, '[t]he elements of negligence are: (1) defendant's obligation to

25  conform to a certain standard of conduct for the protection of others against unreasonable risks

26  (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close

27  connection between the defendant's conduct and resulting injuries (proximate cause); and (4)

28  actual loss (damages).'"  *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009) (quoting *McGarry*

United States District Court
Northern District of California

1  *v. Sax*, 158 Cal. App. 4th 983, 994 (2008)).  Alliant asserts in conclusory fashion that its duty of

2  care to Rodrigues derives from the contract; it argues that because her breach of contract claim

3  fails, Alliant did not owe her a duty of care.  Mot. at 11.  As the court concludes that Rodrigues

4  has stated a cognizable breach of contract claim, Alliant's argument for dismissal of the

5  negligence claim fails as well.[12]

6      **E.      Conversion**

7      "Conversion is the wrongful exercise of dominion over the property of another."  *Hodges*

8  *v. Cty. of Placer*, 41 Cal. App. 5th 537 (2019).  "The elements of a conversion claim are: (1) the

9  plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a

10  wrongful act or disposition of property rights; and (3) damages."  *Id.*  "Money may be the subject

11  of conversion if the claim involves a specific, identifiable sum."  *Welco Elecs., Inc. v. Mora*, 223

12  Cal. App. 4th 202, 209 (2014).  The "plaintiff must establish an actual interference with his

13  ownership or right of possession."  *Moore v. Regents of Univ. of California*, 51 Cal. 3d 120, 136

14  (1990).  "[W]here plaintiff neither has title to the property alleged to have been converted, nor

15  possession thereof, he cannot maintain an action for conversion."  *Id.*  However, "[a] party need

16  only allege it is entitled to immediate possession at the time of conversion."  *Farmers Ins. Exch. v.*

17  *Zerin*, 53 Cal. App. 4th 445, 451 (1997).

18      Alliant argues that "Rodrigues cannot demonstrate a right to possession for the monies that

19  Alliant allegedly converted."  Mot. at 11.  Rodrigues simply counters that she does have a right to

20  possession.  Opp'n at 16.

21      Rodrigues's conversion claim is not cognizable.  "California law is well-settled in this area

22  that a claim against the bank for conversion will not lie."  *Chavez v. Bank of Am. Corp.*, No. C-10-

23  0653-JCS, 2012 WL 1594272, at *11 (N.D. Cal. May 4, 2012).  "[W]hen funds are deposited, title

24  to those funds passes immediately to the bank. Since the money thus becomes the literal property

25  of the bank, it cannot be tortiously converted by the bank."  *Gutierrez v. Wells Fargo & Co.*, 622

26

27  _____

28  [12] Alliant's other argument, based on the joint ownership theory, fails for the same reason it does
    for the breach of contract claim.

18

United States District Court
Northern District of California

1    F. Supp. 2d 946, 956 (N.D. Cal. 2009); *see Morse v. Crocker Nat'l Bank*, 142 Cal. App. 3d 228,

2    232 (1983) ("Title to the deposited funds passes immediately to the bank which may use the funds

3    for its own business purposes. The bank does not thereby act as trustee and cannot be charged with

4    converting the deposit to its own use" (internal citations omitted)). Here, Rodrigues alleges she

5    deposited $55,000 in her name alone to open the CD. FAC ¶ 11. In so doing, title to that property

6    passed to Alliant. Consequently, Rodrigues cannot claim ownership rights to the funds in

7    question. *See Moore*, 51 Cal. 3d at 136; *Morse*, 142 Cal. App. 3d at 232. The court dismisses the

8    conversion claim with prejudice.

9         **F.    California Financial Code § 1450**

10        Rodrigues brings a standalone claim under Financial Code section 1450. Rodrigues claims

11   that Boger's May 29, 2020 letter to Alliant was a "notice of an adverse claim" that Alliant was

12   required to disregard under Financial Code section 1450. FAC ¶ 41; *see also* Opp'n at 17.

13   Instead, Alliant heeded Boger's adverse claim and restricted Rodrigues's access to the accounts.

14   FAC ¶ 41. Alliant argues that section 1450 does not apply because Craig is not an adverse

15   claimant as the accounts are jointly held; even if the law did apply, Alliant complied with its

16   requirements. Both of these arguments raise factual issues that are not appropriate for disposition

17   at the pleadings stage. Therefore, the motion to dismiss the section 1450 claim is denied.

18        It is not clear to the court that Rodrigues can bring a legal claim for relief under section

19   1450. "Section 1450 merely exhibits the requirements for mandatory account freezing in certain

20   circumstances." *Hawkins v. Bank of Am., N.A.*, No. 17-cv-01954-BAS, 2018 WL 1316160, at *3

21   (S.D. Cal. Mar. 14, 2018). The statute stands for the principle that "a bank has no duty to monitor

22   trust accounts for breaches of fiduciary duty." *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532,

23   536 (1998); *see also AARTS Prods.*, 179 Cal. App. 3d at 1069 (the law's purpose is

24   "protect banks from getting caught in a crossfire between its depositors and strangers claiming

25   entitlement to its accounts").[13] The language of section 1450 does not expressly confer a private

26

27   ─────────────────────

28   [13] *Chazen* and *AARTS Productions* cite to former California Financial Code section 952, which
     was repealed in 2011 but recodified as section 1450. The revisions do not appear material.

United States District Court
Northern District of California

1    right of action to challenge a bank's actions upon receipt of an adverse claim notice.  The court

2    declines to reach the issue at this juncture because Alliant did not raise it in this motion, but it may

3    do so at summary judgment accompanied by adequate legal support.

4              **G.       UCL Claim Based on Violation of the Truth in Savings Act Claim**

5              The court considers the UCL and Truth in Savings Act ("TISA") Regulation DD together

6    in light of Rodrigues's concession at the hearing that her UCL claim is predicated on an

7    underlying TISA violation, and that she is not asserting a standalone TISA claim.[14]

8              The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus.

9    & Prof. Code § 17200.  "The UCL operates as a three-pronged statute."  *Beaver v. Tarsadia*

10   *Hotels*, 816 F.3d 1170, 1177 (9th Cir. 2016).  The "unlawful" prong "borrows violations of other

11   laws and treats them as unlawful practices that the unfair competition law makes independently

12   actionable."  *Beaver*, 816 F.3d at 1177 (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel.*

13   *Co.*, 20 Cal. 4th 163, 180 (1999)).  "Violations of federal statutes, including those governing the

14   financial industry, may serve as the predicate for a UCL cause of action."  *Rose v. Bank of Am.,*

15   *N.A.*, 57 Cal. 4th 390, 394 (2013).  The TISA, which "regulates banks' disclosures to customers,"

16   is one such statute.  *Id.* at 393, 399.  However, "[t]o constitute an 'unlawful' business act, a

17   plaintiff must allege facts sufficient to show a violation of some underlying law."  *Iron Bridge*

18   *Mortg. Fund, LLC v. Bank of Am., N.A.*, 539 F. Supp. 3d 1030, 1040 (N.D. Cal. 2021) (citing

19   *People v. McKale*, 25 Cal. 3d 626, 635 (1979)).

20             A UCL claim may only be brought by "a person who has suffered injury in fact and has

21   lost money or property as a result of the unfair competition."  Cal. Bus. & Prof. Code § 17204.

22   Therefore, to satisfy the UCL's standing requirements, a plaintiff must "demonstrate some form of

23   economic injury," such as being deprived of money or property.  *Kwikset Corp. v. Superior Court*,

24   51 Cal. 4th 310, 323 (2011).  "Equitable remedies (injunctive relief, restitution, and civil penalties)

25   are the only remedies available" under the UCL.  *Adir Int'l, LLC v. Starr Indem. & Liab. Co.*, 994

26

27   [14] In light of Rodrigues's concession and binding law that "TISA does not provide a private right
     of action to enforce its provisions," *Vathana v. EverBank*, 770 F.3d 1272, 1278 (9th Cir. 2014),
28   the court dismisses the FAC's seventh cause of action under TISA with prejudice.

1    F.3d 1032, 1043 (9th Cir. 2021).

2         The TISA, 12 U.S.C. § 4301 *et seq.*, "governs disclosures relating to deposit accounts." *In*

3    *re Wash. Mut. Overdraft Prot. Litig.*, 539 F. Supp. 2d 1136, 1148 (C.D. Cal. 2008).  The Act

4    requires a "clear and uniform disclosure" of interest rates on deposit accounts and fees assessed

5    against deposit accounts.  12 U.S.C. § 4301(b).  TISA's implementing Regulation DD "requires

6    depository institutions to provide disclosures so that consumers can make meaningful comparisons

7    among depository institutions." 12 C.F.R. § 1030.1(b).  Relevant here, Regulation DD defines a

8    grace period as "a period following the maturity of an automatically renewing time account during

9    which the consumer may withdraw funds without being assessed a penalty."[15]  12 C.F.R.

10   § 1030.2(m); *accord* FAC ¶ 53.

11        In her UCL claim, Rodrigues alleges that Alliant violated Regulation DD by freezing the

12   disputed CD during the grace period (May 26, 2020 to June 5, 2020) and not disregarding the

13   notice of adverse claim, which precluded her from accessing the CD during its grace period.

14   Compl. ¶¶ 54-55.  She further alleges in the context of her UCL claim that this conduct

15   "constitute[d] unlawful, unfair, or fraudulent business practices" that "present a threat and

16   likelihood of harm."  FAC ¶¶ 49-52.  She seeks an injunction prohibiting Alliant from continuing

17   their "deceptive business practices."  *Id.* ¶ 51.

18        The court finds that Rodrigues has failed to state an underlying TISA violation that

19   supports a UCL "unlawfulness" claim.  TISA and Regulation DD impose disclosure requirements

20   for interest rates and fees on deposit accounts to allow consumers to make informed decisions

21   about their accounts.  12 U.S.C. § 4301(b); 12 C.F.R. § 1030.1(b).  The court's own research

22   could not locate any reference to "grace periods" in TISA's statutory text.  *See generally* 12

23   U.S.C. §§ 4301-13.  With respect to grace periods, Regulation DD simply requires account

24   disclosures to include "[a] statement of whether or not the account will renew automatically at

25   maturity. If it will, a statement of whether or not a grace period will be provided and, if so, the

26

27        ─────────────────

28   [15] Rodrigues and Alliant both mis-cite Regulation DD as 12 C.F.R. § 230.2(m), which is a prior version of the regulation.

United States District Court
Northern District of California

21

1     length of that period must be stated.  If the account will not renew automatically, a statement of

2     whether interest will be paid after maturity if the consumer does not renew the account must be

3     stated."  12 C.F.R. §§ 1030.4(b)(6)(iv).  Subsequent disclosures "may be mailed or delivered at

4     least 20 calendar days before the end of the grace period on the existing account, provided a grace

5     period of at least five calendar days is allowed."  12 C.F.R. § 1030.5(b).  Because Rodrigues does

6     not allege that Alliant failed to issue the requisite disclosures, the FAC fails to state a plausible

7     TISA violation.  *Compare Rose v. Bank of Am., N.A.*, 133 Cal. Rptr. 3d 615, 619 (2011) (claiming

8     TISA violations via the UCL related to a bank's failure to notify putative class about price

9     increases on fees applicable to their deposit accounts), *rev'd*, 57 Cal. 4th at 400.[16]  Accordingly,

10    the UCL claim is dismissed with prejudice.

11    **IV.    CONCLUSION**

12          For the foregoing reasons, Alliant's motion to dismiss the FAC for lack of subject-matter

13    jurisdiction is denied.  Alliant's motion to dismiss the breach of contract, negligence, and

14    Financial Code section 1450 claims is also denied.  The conversion, TISA, and UCL claims are

15    dismissed with prejudice.

16          The parties shall appear for a case management conference on July 14, 2022 at 1:00 p.m. in

17    conjunction with the hearing on Rodrigues's pending motion to compel.  No updated joint case

18    management statement is required.

19

20

21    **IT IS SO ORDERED.**

22    Dated: July 1, 2022



23    Judge Donna M. Ryu

24    United States Magistrate Judge

25

26

27    _____

28    [16] The putative class in *Rose* alleged statutory and regulatory TISA violations.  57 Cal. 4th at 394 n.3.