UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE RODRIGUES,<br><br>                      Plaintiff,<br><br>      v.<br><br>ALLIANT CREDIT UNION,<br><br>                      Defendant. | Case No.  21-cv-01111-DMR<br><br>**ORDER ON MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Docket Nos. 102, 111 |

Plaintiff Joanne Rodrigues filed this action against Defendant Alliant Credit Union ("Alliant") alleging that Alliant violated its account agreement when it froze access to her bank accounts as part of her divorce proceedings.  Alliant moves for summary judgment, or in the alternative, summary adjudication.  [Docket Nos. 102 ("Mot."); 108 ("Reply").][1]  Rodrigues opposes.  [Docket No. 107 ("Opp'n").]  The court held a hearing on October 13, 2022.  For the following reasons, the motion is granted.

I.      **BACKGROUND**

      **A.  Factual Background**

      The following facts are undisputed except where noted.[2]  Rodrigues is the mother of two children.  She is presently going through a divorce.  Alliant is a financial institution that provides banking and loan related services to its members.  [Docket No. 102-2, Ex. 1 (Brom Decl., Sept. 8, 2022) ¶ 4.]  On January 5, 2018, Rodrigues opened savings and checking accounts with Alliant,

---

[1] Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] The court does not include every fact submitted by the parties—only those relevant to the motion.

United States District Court
Northern District of California

with account numbers XXX1977-01 and XXX1977-40 respectively.  Brom Decl. ¶¶ 15, 17; [Docket No. 107-1 (Rodrigues Decl., Sept. 22, 2022) ¶ 11.]  As a result, the parties entered into a written membership and account agreement.  *See* Brom Decl. ¶ 8; Rodrigues Decl. ¶ 11.  At the hearing, both parties confirmed that this dispute arises out of Alliant's alleged breach of the 2019 account agreement (the "Account Agreement").  The Account Agreement provides in relevant part:

> 2e. JOINT OWNER ACCOUNTS
> **An account owned by two or more parties is a jointly owned account.**
> . . .
>
> b) Control of Jointly Owned Accounts. **Any owner is authorized to and deemed to act for any other owner(s) and may instruct Alliant regarding transactions and other account matters.** Each owner guarantees the signature of any other owner(s). Any owner may withdraw all but $5.00 of the funds in the primary savings account, request stop payment(s) on items, transfer, or pledge to us all or any part of the shares without the consent of the other owner(s). We have no duty to notify any owner(s) about any transaction. We reserve the right to require written consent of all owners for any change to or termination of an account. **If we receive written notice of a dispute between owners or inconsistent instructions from them, we may suspend or terminate the account and require a court order or written consent from all owners to act.**
>
> 7. TRANSACTION LIMITATIONS
> a. <u>Withdrawal Restrictions.</u> … **We may refuse to allow a withdrawal in some situations, and will advise you accordingly; for example: (1) a dispute between account owners** (unless a court has ordered Alliant to allow the withdrawal); (2) a legal garnishment or attachment is served; (3) the account secures any obligation to us; (4) required documentation has not been presented; (5) you fail to repay an Alliant loan on time.
>
> 11. ALLIANT LIABILITY
> If we do not properly complete a transaction according to this Agreement, we will be liable for your losses or damages not to exceed the amount of the transaction, except as otherwise provided by law. **We will not be liable if:** (1) your account contains insufficient funds for the transaction; (2) circumstances beyond our control prevent the transaction; (3) your loss is caused by you or another financial institution's negligence; or **(4) your account funds are subject to legal process or other claim.** We will not be liable for consequential damages, except liability for wrongful dishonor. We exercise ordinary care if our actions or non-actions are consistent with applicable state law, Federal Reserve regulations and operating letters, Clearinghouse rules, and general banking practices followed in the area we serve. You grant us the right, in making payments of deposited funds, to rely exclusively on the form of the account and

United States District Court
Northern District of California

the terms of this Agreement. Any conflict between what you or our employees may say or write will be resolved by reference to this Agreement.

Brom Decl., Ex. C at 66, 68, 70 (emphasis added).  Alliant states that at all times from January 16, 2018 to the present, Nathan Craig—Rodrigues' spouse—was a joint owner on Rodrigues' savings and checking accounts.  Brom Decl. ¶ 18.  Rodrigues confirmed this fact at the hearing.

On May 26, 2019, Rodrigues opened a share certificate with Alliant in her name only under account number XXX1977-60 and deposited $55,000 into it with a one-year maturity date (the "Share Certificate").  [Docket No. 107-2, Ex. 8 (Notice of Certificate, May 26, 2019)]; *see* Rodrigues Decl. ¶ 12.  Alliant sent her a Notice of Certificate, which provided a grace period for the Share Certificate from May 26, 2020 through June 5, 2020.  *See* Brom Decl., Ex. F (Notice of Certificate, May 26, 2019); [Docket No. 107-2, Ex. 8 (same submitted by Rodrigues).]  The Notice of Certificate states the following under the section "Truth in Savings Disclosure for Certificate Accounts":

> Automatic Renewal: Unless you have indicated otherwise, your Certificate will automatically renew upon maturity. You may prevent renewal if we receive notice from you before maturity of your intention not to renew. Each renewal term will be the same as the original term, beginning on the maturity date. If Alliant no longer offers a Certificate with that term, you will be required to select a term from the available options at the time of maturity. The dividend rate will be the same we offer on new Certificate accounts on the maturity date which have the same term, minimum balance, and other features as the original Certificate account.

*Id.*  The specific details regarding Rodrigues' Share Certificate are listed on the Notice of Certificate:

> Last 4 digits of Account Number: 1977
> Certificate Description: Share Certificate
> Certificate Account ID: 60
> Original Funding Source: Transfer from share 01
> Open Date: 05/26/19
> Maturity Date: 05/26/20
> **Maturity Selection: Transfer to [XXX]1977 Share 01**
> Deposit Amount: 55,000.00
> Term: 366 Days
> Dividend Rate: 2.667%
> APY: 2.7%
> Monthly Dividend Payment Option: To Certificate

3

United States District Court
Northern District of California

*Id.* (emphasis added).  Alliant states that on May 26, 2020, the Share Certificate transferred to Savings account number XXX1977-01 (as discussed below, one of the accounts that Alliant subsequently froze), and the Share Certificate account was closed.  Brom Decl. ¶ 23.  Rodrigues disputes the particulars of the Share Certificate's maturity selection and transfer.[3]

On February 27, 2020, Rodrigues initiated marriage dissolution proceedings against Craig in Santa Clara County Superior Court.  Rodrigues Decl. ¶ 15; [*see also* Docket No. 102-2, Ex. 4 (Petition for Dissolution of Marriage).]  The family court instituted a Standard Family Law Restraining Order ("SFLRO") which provided that Rodrigues and Craig were restrained from "transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, real or personal, whether community, quasi-community; or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life[.]"  [Docket No. 102-2, Ex. 4 at 303.]

On May 22, 2020, Rodrigues received an email from Alistair Shaw, Craig's attorney in the dissolution proceedings, stating that they would be advising Customers Bank, VIO Bank, and Alliant that a proceeding for dissolution of marriage had commenced and that the SFLRO applied to those accounts.  [Docket No. 107-2, Ex. 14.]  On May 29, 2020, Gretchen Boger, Shaw's colleague, sent a letter to Alliant demanding that they freeze all of Rodrigues' accounts pursuant to the SFLRO:

> […] Pursuant to the SFLRO, both parties are restrained from transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, whether community or separate. Without an agreement of the parties or an order of the Court. The SFLRO covers all property, including the accounts held by [Alliant] in Mrs. Rodrigues-Craig's name […]
>
> Mr. Craig does not consent to any withdrawals or transfers of any kind regarding the accounts in Mrs. Rodrigues-Craig's name held with Alliant Credit Union. These accounts cannot be accessed by Mrs. Rodrigues-Craig unless there is a court order permitting it. Likewise,

---

[3] Rodrigues contends that the Notice of Certificate informed her that the Share Certificate would automatically renew, that she did not request "non-renewal" as a maturity selection for the Share Certificate, and that she did not receive a maturity notice for the Share Certificate prior to the transfer.  Rodrigues Decl. ¶¶ 12-13, 20; *see also* Opp'n 19-20.  Rodrigues also argues that Alliant should have allowed her to conduct transactions on the Share Certificate on June 1, 2020, during the grace period.  Opp'n 19-20.

> there should be no transfers made from these accounts . . . In the event
> any funds are found to be transferred out of these accounts, my office
> will hold Alliant Credit Union liable for its violation of the SFLRO.
> These accounts should be frozen or locked by your institution.

[Docket No. 107-2, Ex. 15.] Shortly after, on June 1, 2020, Alliant froze the disputed accounts.

Rodrigues Decl. ¶¶ 24-25.

The same day, Alliant's counsel responded to Craig's attorneys confirming that "Ms. Rodrigues-Craig's accounts ha[d] been frozen in light of [Craig's attorneys'] threat to hold the credit union liable for any withdrawals allegedly in violation of the standard restraining order in the case[.]" [Docket No. 107-2, Ex. 17 at 198.] Alliant's counsel also noted that Craig's attorneys had overstated and misrepresented the scope of the restraining order, and that the restraining order at issue permitted the parties to make withdrawals in the "usual course of business or for the necessities of life." *Id.* Finally, Alliant's counsel asked that Craig's attorney meet and confer with Rodrigues to "provide instructions to the credit union that are consistent with the terms of the restraining order." *Id.* In the alternative, Alliant suggested that Rodrigues "ask the [family law] court to assist her in correcting [the attorneys'] misrepresentation of the restraining order and providing guidance to the credit union on the amount of withdrawals the credit union should permit." *Id.* Rodrigues was copied on the email. *Id.*

Rodrigues states that she and Craig used their Alliant accounts for "the necessities of life." Rodrigues Decl. ¶ 7. Rodrigues submits evidence that she used funds in these accounts to pay for electricity bills, DMV fees, day care, rent, lawyers' fees, and car insurance, among other expenses. [Docket No. 107-2, Exs. 4 (Alliant checks), 18 (Alliant overdraft notice pursuant to PG&E withdrawal).] Rodrigues asserts that once the disputed accounts were frozen, her parents helped financially support her two children. Rodrigues Decl. ¶ 9. She proffers evidence that her parents paid for costs related to their grandchildren's stays in Santa Clara, food delivery, and trips to Target, Walmart, grocery stores, and pharmacies. [Docket No. 107-2, Ex. 6 (chart).] Finally, Rodrigues states that her parents helped pay for legal fees related to this lawsuit. Rodrigues Decl. ¶ 10; [*see* Docket No. 107-2, Ex. 7.] Once her Alliant accounts were frozen, Rodrigues was concerned she would not have access to funds in other banks to cover these expenses. [*See* Docket No. 107-2, Ex. 17 (June 8, 2020 email from Rodrigues to Alliant stating: "Again I'm not clear

United States District Court
Northern District of California

how Mr. Shaw can decide that multiple other accounts are sufficient for 'necessities of life,' especially given that they sent this letter to multiple financial institutions in an attempt to freeze other accounts.").]

Alliant states it has never received further clarification from the family law court, joint instructions from Rodrigues and Craig, or any direction as to what would be considered a withdrawal in the usual course of business or for the necessities of life.  Brom Decl. ¶ 31.  The bank has not received notice of a court ordered resolution regarding the SFLRO, or a settlement regarding assets in the marriage dissolution case.  *Id.* ¶ 33.  Alliant asserts that Plaintiff in fact expressed the desire to keep the accounts frozen; on July 29, 2020, Alliant's counsel was copied on an email from Rodrigues to attorney Boger stating: "I do Not agree to unfreeze and split the money in any account until there is a court-ordered resolution regarding [Craig]'s misrepresentation of the scope of the SFLROs on all bank accounts and a court-ordered settlement regarding all assets in this case."  *Id.* ¶ 32; [Docket No. 102-2, Ex. N.]

The disputed accounts have remained frozen since June 1, 2020.  Brom Decl.  ¶ 33.  At that time, the balance in the checking account was $64.66 and the balance in the savings account was $57,384.13.  *Id.* ¶ 35; *see* Rodrigues Decl. ¶ 25.  Alliant states that the account balances are now $39.66 and $58,240.01 respectively due to transactions and interest.  Brom Decl. ¶ 35.

Rodrigues contends she suffered damages as a result of Alliant freezing her accounts.  Opp'n 22-24.  Notably, she argues she was harmed because she was prevented from accessing the disputed accounts to pay for "necessities of life"; she lost interest on the funds in the disputed accounts; she suffered a drop in her credit score due to an unpaid PG&E bill that was sent to collections; and she was forced to ask her parents for financial support.  *Id.*

**B.  Procedural History**

On February 14, 2021, Rodrigues filed her original complaint alleging breach of contract, negligence, conversion, violations of California Financial Code section 1450 and the California Unfair Competition Law ("UCL"), and a claim for declaratory relief.  She requested compensatory damages, injunctive relief, restitution, declaratory relief, and fees and costs.

On December 17, 2021, Rodrigues filed an amended complaint alleging a seventh claim

6

1   for relief under the Truth in Savings Act ("TISA") and its implementing regulations.  [Docket No.

2   47 (First Amended Complaint ("FAC")).]  Alliant moved to dismiss the FAC on January 18, 2022

3   on jurisdictional and other grounds.  On July 1, 2022, the court denied Alliant's motion to dismiss

4   the FAC for lack of subject-matter jurisdiction.  [Docket No. 84.]  The court also denied the

5   motion to dismiss the breach of contract, negligence, and Financial Code section 1450 claims.  *Id.*

6   The conversion, TISA, and UCL claims were dismissed with prejudice.  *Id.*  Alliant now moves

7   for summary judgment, or in the alternative, summary adjudication.

## II.   EVIDENTIARY MATTERS

### A.   Request for Judicial Notice

10      Alliant asks the court to take judicial notice of nine documents (Exhibits 4-12).  [Docket

11   No. 102-3 (Request for Judicial Notice ("RJN")).]  Rodrigues objects only with respect to Exhibits

12   5-12; she argues that the facts underlying these exhibits are in dispute and Alliant did not rely on

13   the documents when deciding to freeze Rodrigues' accounts.  [Docket No. 107-3 (Objection to

14   Judicial Notice).]  She does not object to Exhibit 4, which is a copy of the summons from

15   Rodrigues' state court marriage dissolution case.  Objection to Judicial Notice 3.

16      As the court does not rely on Exhibits 4-12 in reaching its decision on the motion, Alliant's

17   RJN and Rodrigues' objections to the RJN are denied as moot.

### B.   Objections to Evidence

19      Alliant objects to all inadmissible evidence presented in support of Rodrigues' Opposition.

20   Reply 4.  Specifically, Alliant objects to paragraphs 3, 9, 10, 16, 23, 35, 45, 46, 48, 49, 51, 54-57,

21   and 60-61 of Rodrigues' declaration.  *Id.*  Defendant also objects to Rodrigues' Exhibits 6, 7, 11,

22   13, 16, 27, 29, 30, 31, and 33.  *Id.*

23      Defendant's objections to Rodrigues' evidence are denied as moot.  Although the court

24   describes some of the disputed evidence in its recitation of facts, it does not rely on the evidence in

25   reaching its decision on the motion.  For example, although the recitation of facts describes

26   evidence submitted by Rodrigues to support her claim for damages by showing that she and Craig

27   used their Alliant accounts for "the necessities of life," the court does not reach the question of

28

1    damages.[4]

2    **III.    LEGAL STANDARDS**

3            A court shall grant summary judgment "if…there is no genuine dispute as to any material

4    fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden

5    of establishing the absence of a genuine issue of material fact lies with the moving party.

6    *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477

7    U.S. 317, 323 (1986)).  The court must view the evidence in the light most favorable to the non-

8    moving party.  *Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir.

9    2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  A genuine factual issue

10   exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could

11   return a verdict for the nonmoving party."  *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200

12   F.3d 1223, 1229 (9th Cir. 2000) (alteration in original) (quoting *Anderson*, 477 U.S. at 248).  The

13   court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.

14   *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*,

15   477 U.S. at 255).

16           To defeat summary judgment once the moving party has met its burden, the nonmoving

17   party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as

18   otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of

19   material fact exists.  *Devereaux*, 263 F.3d at 1076.  More than a "scintilla of evidence" must exist

20   to support the non-moving party's claims.  *Pomona*, 750 F.3d at 1049 (quoting *Anderson*, 477

21   U.S. at 252).  A showing that "there is some 'metaphysical doubt' as to the material facts as issue"

22   will not suffice.  *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting

23   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "Where the

24

25   ⎯⎯⎯⎯⎯⎯⎯⎯⎯

26   [4] On October 14, 2022, Rodrigues filed an administrative motion requesting leave to file proof of
     service of several documents produced in discovery.  [Docket No. 111.]  Alliant opposed.  [Docket
     No. 112.]  Rodrigues argues that Defendant misrepresented the fact that she did not provide
27   Exhibits 7, 11, 13, 16, 27, 29, 30, 31, and 33 in discovery.  She requests leave to file proof of
     service of these Exhibits to rebut Defendant's evidentiary objection.  As set forth above, the court
28   does not rely on this evidence because it does not reach the related arguments.  Accordingly,
     Rodrigues' administrative motion is denied as moot.

United States District Court
Northern District of California

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita*, 475 U.S. at 587).

## IV.    ANALYSIS

### A.  Breach of Contract

Defendant moves for summary judgment on Plaintiff's breach of contract claim on the ground that Alliant had a contractual right to freeze the disputed accounts.  Mot. 19.

Under California law, the elements of a breach of contract claim are: (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff.  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (citation omitted).[5]  The parties dispute elements three and four.  The court begins its analysis by determining whether Alliant breached the contract.

Alliant argues it did not breach the Account Agreement because it had the right to freeze the disputed accounts for several reasons that are established in the contract.  First, Craig had a right to direct a freeze of the accounts as a joint owner.  Mot. 19.  Second, the bank received a letter from Craig's counsel on May 29, 2020, which provided Alliant with written notice of a dispute between owners or inconsistent instructions from them thereby giving the bank the right to suspend the accounts until the dispute was resolved through consent of the parties or by court order.  *Id.* 20.  Third, Alliant argues that the contract states that it cannot be held liable for freezing the accounts because they were subject to legal process and claims by Craig.  *Id.* 21.  Rodrigues responds that no provision of the Account Agreement gives Alliant the right to freeze the disputed accounts.[6]  Opp'n 14.  The court first addresses Alliant's argument that it did not breach the Account Agreement because it froze the accounts at the direction of Craig, a joint owner.

---

[5] California law applies to federal diversity cases arising in California.  *Allstate Ins. Co v. Smith*, 929 F.2d 447, 449 (9th Cir. 1991).

[6] Rodrigues also argues that Alliant failed to present "the banking statutory or regulatory requirements" that allowed the bank to freeze her accounts.  Opp'n 14.  As these frameworks have no bearing on the breach of contract claim, the court does not address the argument.

United States District Court
Northern District of California

### 1.     Plain Language of the Account Agreement re: Joint Owner Rights

Section 2e(b) of the Account Agreement provides:

> 2e. JOINT OWNER ACCOUNTS
> **An account owned by two or more parties is a jointly owned account.**
> **. . .**
>
> b) Control of Jointly Owned Accounts. **Any owner is authorized to and deemed to act for any other owner(s) and may instruct Alliant regarding transactions and other account matters.** Each owner guarantees the signature of any other owner(s). Any owner may withdraw all but $5.00 of the funds in the primary savings account, request stop payment(s) on items, transfer, or pledge to us all or any part of the shares without the consent of the other owner(s). We have no duty to notify any owner(s) about any transaction. We reserve the right to require written consent of all owners for any change to or termination of an account. If we receive written notice of a dispute between owners or inconsistent instructions from them, we may suspend or terminate the account and require a court order or written consent from all owners to act.

Brom Decl., Ex. C at 66 (emphasis added).

"The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity," Cal. Civ. Code § 1638, and the words of a contract are to be understood in their "ordinary and popular sense unless used by the parties in a technical sense or a special meaning is given to them by usage[.]" *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (internal quotation marks omitted), *as modified on denial of reh'g* (Oct. 26, 1995). "Summary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning." *United States v. King Features Ent., Inc.*, 843 F.2d 394, 398 (9th Cir. 1988).

Here, the relevant highlighted language of Section 2e(b) is clear and neither party disputes its meaning.[7] *See* Mot. 19; Opp'n 16.

### 2.     Joint Ownership of the Frozen Accounts

Alliant argues that it properly froze the accounts because it did so at the direction of Craig, who owned the accounts jointly with Rodrigues.  Mot. 19.  At the hearing, Rodrigues conceded

---

[7] The parties dispute the meaning of other terms in the Account Agreement, e.g., "written notice of a dispute between owners" (*see* Opp'n at 17) and "legal process" (*see id.* at 20).  Those terms are not relevant to Alliant's first argument.

that the disputed accounts are jointly held by Rodrigues and Craig, and the record is clear on this point. [*See* Docket No. 107-2, Exs. 4 (Alliant statements from January 2020 through April 2020 showing Nathan Craig as a joint owner on accounts XXX-1977-01 and XXX1977-40); 17 (June 5, 2020 email from Rodrigues to Alliant's counsel stating: "I'm still unclear about the meaning of the May 14th email, as Mr. Craig is a joint owner on the Alliant Credit Union accounts. If [Craig's counsel] are objecting to un-freeze these accounts because of him not being a joint owner on the account, to the best of my knowledge he already is.").] Accordingly, it is undisputed that the frozen accounts are jointly owned by Rodrigues and Craig.

### 3. The Share Certificate

Rodrigues' rebuttal to the question of joint ownership is rooted in the Share Certificate, which she held in her own name. Opp'n 19. At bottom, Rodrigues argues that Alliant improperly transferred the funds from the Share Certificate to the jointly owned savings account.[8] *See id.* Put another way, without conceding that Alliant had the right to freeze the savings account at joint owner Craig's direction, Rodrigues instead argues that Alliant violated her rights by transferring her Share Certificate funds into the savings account in the first place.

Alliant responds with two arguments. First, Alliant contends that the Share Certificate is not at issue because this lawsuit challenges Alliant's conduct in freezing the accounts on June 1, 2020, and it is undisputed that the Share Certificate matured several days before that date on May 26, 2020, at which time all funds transferred to the savings account and the Share Certificate was closed. Reply 10.[9] Second, Alliant asks the court to disregard Rodrigues' arguments regarding the Share Certificate because she did not put Alliant on notice of this theory during discovery. *Id.* 11. According to Alliant, Rodrigues was asked to explain the factual basis for each of her claims

---

[8] Rodrigues confirmed this at the hearing.

[9] At the hearing, Rodrigues questioned whether Alliant initially froze the Share Certificate in addition to the jointly held accounts and argued that the transfer of funds from the Share Certificate to the savings account was not clear. Conclusory assertions without evidentiary support are insufficient at summary judgment. *See In re Oracle Corp. Secs. Litig.*, 627 F.3d at 387. Rodrigues does not submit any evidence to dispute that Alliant transferred the funds from the Share Certificate to the savings account on May 26, 2020, or that the Share Certificate no longer existed when the disputed accounts were frozen. [*See* Brom Decl. ¶ 31; Docket No. 102-2, Ex. F (Notice of Certificate).]

United States District Court
Northern District of California

during her deposition. *Id.* In response, Plaintiff referred to her FAC and stated that she believed Alliant's freezing of the accounts was improper. *Id.*; [*see* Docket No. 102-2, Ex. 3 (Rodrigues Depo.) at 30:9-44:12.] After meeting and conferring about deficiencies in Plaintiff's written discovery responses, Plaintiff submitted supplemental interrogatory responses on September 8, 2022. Reply 11. Supplemental Interrogatory Nos. 1, 4, 7, and 10 asked Plaintiff to state all facts in support of her claims. [*See* Docket No. 102-2, Ex. 16.] Plaintiff's amended responses stated that the factual basis for each claim was in the FAC. *See id.* None of her discovery responses discuss the Share Certificate.

The court agrees with Alliant that Plaintiff did not put Alliant on notice of her argument that the Share Certificate funds were improperly transferred, nor did she otherwise disclose this theory of liability during discovery. Plaintiff also failed to explain—both in briefing and at the hearing—how the theory relates to a breach of the Account Agreement. "In general, new factual allegations and claims should not be raised for the first time in an opposition to summary judgment." *Aguirre v. Ducart*, No. 4:17-CV-06898-YGR, 2021 WL 212898, at *4 (N.D. Cal. Jan. 21, 2021) (citing *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006)), *aff'd,* No. 21-15269, 2022 WL 3010169 (9th Cir. July 29, 2022). Moreover, offering a new theory of liability at summary judgment violates this court's September 2, 2022 order which directed the parties to supplement their disclosures and discovery responses pursuant to Federal Rule of Civil Procedure 26(e) by no later than September 9, 2022. *See* Docket No. 101. The order stated that the parties would be precluded from proffering witnesses or evidence at summary judgment or at trial that was not provided to the other side by the September 9, 2022 deadline. *Id.*

As the FAC, written discovery responses, and deposition testimony fail to raise the argument that Alliant somehow improperly transferred the funds from the Share Certificate to the joint savings account, this new theory of liability cannot be considered. In addition, because Rodrigues has not explained how the theory relates to a breach of the Account Agreement, it is outside the scope of the FAC.[10]

---

[10] Rodrigues acknowledged this during the hearing, conceding that the Share Certificate was a "subpoint."

1

### 4.      Whether Craig Instructed Alliant to Freeze the Disputed Accounts

2
3
4
5
6
7
8

Turning to whether Alliant lawfully froze the disputed accounts pursuant to Craig's instructions, Plaintiff argues that Defendant's motion should be denied because the request was made by Craig's attorney, not Craig.[11]  Opp'n 17-18.  Rodrigues contends that attorney Boger was not a "designated agent" on any of the disputed accounts (*id.* at 18), citing Section 3 of the Account Agreement, which states that "[a]n agency designation on an account is an instruction to us that the owner authorizes another person to make transactions as agent for the account owner regarding the accounts designated."  *See* Brom Decl., Ex. C at 67.

9
10
11
12
13
14
15
16
17
18
19

Rodrigues' reliance on Section 3 is misplaced.  There is no record evidence or argument that Boger attempted to make a banking transaction as Craig's agent.  Rather, the undisputed evidence demonstrates that Boger communicated with Alliant on behalf of Craig, who is her client in the dissolution proceeding.  *See* Brom Decl., Ex. L at 147 (May 29, 2020 email from Boger to Alliant stating: "I represent Mr. Nathan Craig in his dissolution of marriage from Mrs. Joanne Rodrigues-Craig."); [*see also* Docket No. 107-2, Ex. 5 at 91 (listing Gretchen Z. Boger and Alistair D. Shaw as Craig's attorneys in the dissolution proceeding).]  An attorney is an authorized representative of a person or entity and has the right to act on their client's behalf in the course of the legal representation.  Cal. Rules of Professional Conduct, rule 1.2(a), Comment [1] ("A lawyer retained to represent a client is authorized to act on behalf of the client, such as in procedural matters and in making certain tactical decisions.").

20
21
22

At the hearing, Rodrigues conceded that no evidence suggests that attorney Boger was not acting on Craig's behalf when she sent the May 29, 2020 email.  In fact, evidence submitted by Rodrigues demonstrates that Craig was aware of his attorney's actions.  [Docket No. 107-2, Ex. 5

23

24
25
26
27
28

[11] Rodrigues also argues that Defendant's motion should be denied because Alliant first represented that it froze the accounts because of the liability threat in attorney Boger's email, not pursuant to Section 2e. of the Account Agreement.  Opp'n 16.  Rodrigues contends that Alliant continued to make this representation throughout the discovery process.  *Id.*  For purposes of the legal analysis, this argument does not shed light on whether Alliant breached the Account Agreement (the third element in a breach of contract claim).  At any rate, even though Alliant's interrogatory responses do not specifically mention Section 2e. of the Account Agreement, the responses refer to the Account Agreement as a whole.  [*See* Docket No. 107-2, Ex. 2 at 33.]  The Account Agreement has been at issue since the beginning of the litigation, and Alliant relies on a provision that clearly addresses the facts alleged in the FAC for breach of contract.

United States District Court
Northern District of California

(Craig Decl., Aug. 10, 2022) at 100 ("[O]n May 22, 2020, my attorney informed Wife that if we did not hear from her, we would contact VIO bank, Alliant Credit Union, and Customers Bank requesting that Wife's bank accounts be frozen … On May 29, 2020, my attorney sent letters to the three banks requesting that the accounts be frozen.").]  The evidence also suggests that Rodrigues attributed Boger's directives to Craig.  *See* Brom Decl., Ex. N (July 9, 2020 email from Rodrigues to Boger stating: "I do NOT agree to unfreeze and split the money in any account until there is a court-ordered resolution regarding *your client's misrepresentation of the scope of the SFLROs on all bank accounts*[.]") (emphasis added).

In sum, the plain language of the Account Agreement permits Alliant to act on instructions received by joint account holders, and Alliant properly froze the disputed accounts pursuant to instructions from Craig through his attorney.  Accordingly, the court need not reach Alliant's other arguments regarding the elements of breach or damages.  Summary judgment is granted in Alliant's favor on the breach of contract claim.

### B.  Negligence

"Under California law, '[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages).'"  *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009) (alteration in original) (quoting *McGarry v. Sax*, 158 Cal. App. 4th 983, 994 (2008)).  "The existence of a duty of care owed by a defendant to a plaintiff is a prerequisite to establishing a claim for negligence." *Nymark v. Heart Fed. Savs. & Loan Ass'n*, 231 Cal. App. 3d 1089, 1095 (1991) (citation omitted).

Here, Alliant does not dispute that it owes a duty of care to Rodrigues based on their contractual relationship.  Reply 24; *see Roy Supply, Inc. v. Wells Fargo Bank*, 39 Cal. App. 4th 1051, 1076 (1995).  Defendant argues that because Rodrigues' breach of contract claim fails, so does her claim for negligence.  Mot. 24.

Rodrigues responds that Alliant has an implied duty to act with reasonable care in its transactions with depositors.  Opp'n 25; *see Chavez Centennial Bank*, 61 Cal. App. 4th 532, 543

14

1   (1998); *Bullis v. Sec. Pac. Nat. Bank*, 21 Cal. 3d 801, 807 (1978).  As clarified at the hearing,

2   Rodrigues claims that Alliant breached its duty by preventing her from making transactions for

3   "necessities of life."

4        Plaintiff offers no evidence that the Account Agreement gives account holders an

5   unfettered right to make transactions.  Nor does she cite legal support for her position.  In fact,

6   "[c]ase law reflects the narrow scope of a bank's duties under the deposit agreement."  *Kurtz-*

7   *Ahlers, LLC v. Bank of Am., N.A.*, 48 Cal. App. 5th 952, 956 (2020) (listing cases).  In that vein,

8   the Account Agreement provides various circumstances under which Alliant is permitted to

9   restrict its account holders' transactions.  *See* Brom Decl., Ex. C at 68 (Section 7 of the Account

10  Agreement ("Transaction Limitations")).  Here, Section 2e of the Account Agreement provided

11  Alliant with the contractual right to freeze the disputed accounts at the instruction of a joint owner.

12       Accordingly, the court finds that there is no genuine issue of material fact for trial on

13  Rodrigues' negligence claim and grants summary judgment in favor of Alliant.  *See Pomona*, 750

14  F.3d at 1049-50 (quoting *Matsushita*, 475 U.S. at 587).

15       **C.  Financial Code Section 1450**

16       Financial Code section 1450 provides in part:

17            Notice to any bank of an adverse claim (the person making the
             adverse claim being hereafter called "adverse claimant") to a deposit
18           standing on its books to the credit of or to personal property held for
             the account of any person shall be disregarded, and the bank,
19           notwithstanding the notice, shall honor the checks, notes, or other
             instruments requiring payment of money by or for the account of the
20           person to whose credit the account stands and on demand shall deliver
             that property to, or on the order of, the person for whose account the
21           property is held, without any liability on the part of the bank[.]

22  Cal. Fin. Code § 1450.  The statute lists two exceptions to this general rule, neither of which

23  applies here.  *See id.* §§ 1450(a) (affidavit regarding anticipated misappropriation of property by

24  fiduciary), (b) (adverse claim supported by an order or injunction).[12]

25       Alliant argues it is entitled to summary judgment on this claim because Financial Code

26

27  _____

    [12] Although Rodrigues relies on these exceptions, her arguments in this respect require the court to
    find that the disputed accounts were not jointly held.  *See* Opp'n 31.  As explained above, the
28  record does not support such a finding.

15

United States District Court
Northern District of California

1    section 1450 does not provide a private right of action, and even if it did, the statute does not apply

2    to joint account holders.  Mot. 26.  Rodrigues responds that the section's legislative history

3    supports a private right of action, and that Craig was an adverse claimant because the Share

4    Certificate was in her name only.  Opp'n 28-31.  In the alternative, Rodrigues argues that,

5    assuming the accounts were jointly owned, neither she nor Craig requested the accounts be frozen.

6    *Id.* 31.

7            The language of section 1450 does not expressly confer a private right of action to

8    challenge a bank's actions upon receipt of an adverse claim notice.  *See* Cal. Fin. Code § 1450.

9    However, the court need not decide the issue because even if Rodrigues had the right to pursue a

10   violation of section 1450, courts interpreting the predecessor statute to section 1450—identical to

11   the current version of the statute in all material respects—have made clear that it does not apply to

12   disputes arising between joint depositors.  *See AARTS Prods., Inc. v. Crocker Nat'l Bank*, 179 Cal.

13   App. 3d 1061, 1068-69 (1986) ("What little authority exists on this question is unanimous in

14   holding an account holder is not an adverse claimant for this statute's purposes.")[13]  As discussed

15   above, it is undisputed that Rodrigues and Craig are joint account holders.  In addition, as

16   previously explained, it is beyond dispute that Boger was acting in her capacity as Craig's attorney

17   when she contacted Alliant and directed that it freeze the accounts.  Accordingly, summary

18   judgment is granted on the section 1450 claim.

19   **V.    CONCLUSION**

20           As set forth above, Alliant's motion for summary judgment is granted as to Rodrigues'

21   breach of contract and negligence claims because Alliant had the contractual right to freeze the

22   disputed accounts at the direction of a joint account holder.  Summary judgment therefore is also

23   granted as to Rodrigues' fifth cause of action for declaratory relief.[14]  Finally, the court grants

24

25   [13] *AARTS Productions* cites to former California Financial Code section 952, which was repealed
     in 2011 and recodified as section 1450.  The revisions are not material to *AARTS Productions*'
26   analysis on this point.

27   [14] Rodrigues' fifth claim is for declaratory relief.  However, "declaratory relief is not an
     independent cause of action"—only a remedy.  *VIA Techs., Inc. v. SONICBlue Claims LLC*, No. C
28   09-2109 PJH, 2010 WL 2486022, at *3 (N.D. Cal. June 16, 2010); *see also Fiedler v. Clark*, 714
     F.2d 77, 79 (9th Cir. 1983) ("The Declaratory Judgment Act does not provide an independent

United States District Court
Northern District of California

summary judgment as to Plaintiff's Financial Code section 1450 claim because an account holder is not an adverse claimant within the meaning of this statute.  The clerk is directed to close this case.

**IT IS SO ORDERED.**

Dated: November 7, 2022

_____
Donna M. Ryu
United States Magistrate Judge

United States District Court
Northern District of California

_____

jurisdictional basis for suits in federal court.  It only permits the district court to adopt a specific remedy when jurisdiction exists.").

17